## THE KATE.

(District Court, S. D. New York. February 7, 1899.)

CARRIERS—SEAWORTHINESS—STANCHION OVERWEIGHTED—SUPPORTS REMOVED—
BALLAST TANK BROKEN—BAD LOADING—HARTER ACT.

> The steamship K. was chartered to convey a cargo of liquorice from Beyrout and Alexandretta to New York. On sailing, three out of four of the after-stanchions of the after-hatch in the lower hold were down, and the remaining fourth stanchion, during rough weather, broke a hole through the iron cover of the ballast tank on which it rested, causing a leak which damaged the cargo and necessitated repairs in Algiers, during which further damage was done to the cargo; the weight bearing on the single stanchion aft was increased by the stowage of a spare piece of shafting of three tons weight immediately over the stanchion; *held*, that the extra heavy weight stowed immediately over the stanchion and the lack of the additional support of the three other stanchions designed to be used, made the ship unfit for the voyage, and was bad loading, within the first section of the Harter act, and not within the third section; and that the ship was liable for the damage.

In Admiralty. Cargo Damage.

Butler, Notman, Joline & Mynderse, for libelants.
Seward, Guthrie & Steele and Carl A. De Gersdorff, for claimant.

BROWN, District Judge. The libel was filed to recover for the damages to a shipment of 12,500 bales of liquorice, constituting the cargo of the steamship Kate on a voyage from Beyrout to New York from January — to March 25, 1898. Of this cargo, 4,000 bales were shipped at Beyrout, and the remaining 8,500 at Alexandretta, 280 miles distant on the Syrian coast. Soon after coaling at Malta on January 18th, a gale was met of about 12 hours' duration, and afterwards another gale on January 20th, during which the ship took a list to port, and subsequent examination showed that the ballast tank was leaking. The ship being light, it was necessary to keep water in the ballast tank, and being unable to stop the leak, the ship put in to Algiers for repairs. On removing the cargo in the after-hatch, it was found that a stanchion in the lower hold resting on the iron plates that formed the top of the ballast tank, had broken a hole through the plate at the point where it had rested. The damage to the cargo arose from the ballast water that escaped from this tank, and also from the handling of the liquorice in the discharge and reloading for the purpose of repairs.

The storms encountered were not of so extraordinary a character as to allow the breaking of the top of the ballast tank by the stanchion to be considered a sea peril, when the other circumstances are considered. The stanchion was under the beams running athwartship on the line of the after-part of the after-hatch, and about a foot inboard from the after-port corner of the hatchway. Similar stanchions, one above the other, ran to the upper deck, each supporting the beam above. The hatchway was about 16 feet long, and around it there were five

of these stanchions; namely, two forward, one aft, and one on each side of the middle of the hatchway; and at the after-end on the starboard side,. the place of a stanchion was supplied by a vertical iron ladder with two side bars connected by iron rungs for steps.    In the construction of the ship, it is evident, all of these supports were designed to be used to carry the beams of the various decks, and the cargo that rested upon them.    On this voyage it appears that the two side stanchions in the lower hold were never put up at all; and the inference from the master's testimony is, that the ladder which served as a stanchion on the starboard side aft was also down.    The master says (page 33):  "I did not find the ladder put up; but I put it up, * * * now, * * * at New York."    The evidence further shows that a heavy piece of spare shafting weighing three tons was stowed in the between decks immediately over the stanchion in question on the line of the after-part of the hatch.    Thus the weight on the beams around the hatch was exceptionally increased, and especially the bearing upon the stanchion in question, while much of the intended support was removed.    In fact, aft of the forward line of the hatch there was but one stanchion serving for support, whereas in the structure of the ship four were designed to be used.    The stanchion, moreover, rested upon the iron plate of the tank at a point midway between the fore and aft girders on which the iron plates rested which formed the cover of the tank.    At this middle point the adjoining plates lapped each other.    The stanchion was riveted to a flange on each side of it, and the flange was in turn riveted upon the tank plates. In more modern ships the fore and aft girders are placed immediately beneath the stanchion; but the former method was in general use when the Kate was built, and it is not claimed to have been improper or insufficient, provided the beams above were supported as they were designed to be supported.

The evidence, as it seems to me, points unmistakably to the failure to make use of the supports designed to be used, as the cause of this accident.    It was not a sea peril, nor was it a latent defect.    The stowage of a specially heavy weight of three tons immediately above the stanchion in question, without the aid of the three other stanchions that were designed to assist in supporting the beam which carried that weight, in the loading of that part of the ship, constituted an improper loading for the condition in which the ship sailed, and made her unfit to encounter such rough weather as she was liable to meet. The fault arose before the vessel left port.    It was the condition intended and expected to remain permanently for the voyage; not a temporary condition to be made good on the approach of bad weather as in The Silvia, 15 C. C. A. 362, 68 Fed. 230; Id., 171 U. S. 465, 466, 19 Sup. Ct. 7.    The case, so far as affected by the Harter act, therefore, seems to me to fall within the first section rather than the third. Worsted Mills Co. v. Knott, 76 Fed. 582, affirmed 27 C. C. A. 326, 82 Fed. 471.    No clause in the bill of lading specifically covers the case in the defendant's favor; while one clause provides that "all exceptions are conditional on the vessel being seaworthy when she sailed on the voyage."    As respects cargo damaged, the voyage must be deemed commenced at and from the port where the cargo is laden.

Bowring v. Thebaud, 42 Fed. 795; Id., 5 C. C. A. 640, 56 Fed. 520; and cases there cited.

Decree for the libelants with costs.