## THE SMYRNA.

### No. 1843.

District Court, D. Maryland.

Jan. 7, 1932.

William A. Grimes, of Baltimore, Md., for libelant.

John H. Skeen, of Baltimore, Md., for respondent.

**WILLIAM C. COLEMAN,** District Judge.

The claim here arises upon a libel brought by the Barrett Company against the barge Smyrna and its owner, the Wathen Company, for damage to a cargo of sulphate of ammonia in the course of a voyage from New York to Baltimore. The question presented is a relatively narrow one, and resolves itself into the single point, namely, what is the effect of the restrictive clause in the charter party that the cargo shall be shipped on the skin of the vessel at cargo and shipper's risk, when considered in conjunction with the provisions of the Harter Act (46 USCA §§ 190–195), which are also embodied in the charter party.

There are elementary principles so well established in cases of this kind that it is not necessary to cite cases in support of them, namely, that the burden is upon the vessel to prove its seaworthy condition, and to prove such condition in relation to the particular type of cargo and voyage in question.

The court reaches the conclusion that the proper interpretation to be given to the joint use of such a restrictive clause as the one here involved and the Harter Act is that, regardless of the restriction, the Harter Act provisions still require that the vessel shall be seaworthy for the particular voyage and the particular type of cargo; but that interpretation must be given a reasonable construction. A wet ceiling in a barge does not necessarily denote unseaworthiness, as the court understands the law. A certain degree of wetness will, and it is, therefore, a question of degree in all cases. As has been repeatedly said by this court, and of course innumerable times by other courts, the rule of seaworthiness, the standard of seaworthiness, of a barge, particularly a coastwise wooden barge, is not the same standard as that required of other larger and different types of seagoing vessels.

So, in a case of this kind, granting that the Harter Act still controls in its fundamental principles, we have to apply the rule in a common sense way. And that brings us to the question: What does all of the evidence, documentary and otherwise, disclose as to seaworthiness? The court reaches the conclusion that the weight of the present testimony can lead to but one conclusion, and that is that the vessel was, for the requirements in hand, seaworthy.

We find in the stipulated facts that during the voyage the barge did not leak more than customary for such barges, and that the pumps were properly operated. It is testified also, and not contradicted, that the barge, although some twenty-five years old, had, within a reasonable time prior to this particular voyage, been well overhauled.

It is true it is stipulated that at all times twelve inches of water were in the bilges,

since, although unknown to the libelant, the bilge pumps were so constructed that they extended only to within twelve inches of the bottom of the bilges, and that, when the barge encountered heavy weather and started rolling and pitching, it blew its bilges, namely, the water in the bottom twelve inches of the bilges splashed over the ceiling, wetting and dissolving part of the cargo.

The single witness for libelant, Stein, concludes from this situation that the construction of the barge, and the construction of its pumping system, were per se an indication of unseaworthiness. That conclusion the court is unwilling to accept, particularly because the general testimony of the witness Stein is not convincing to the court, for a number of reasons. In the first place he stated that he had not surveyed or seen this barge, and, in the second place, his broad statement that he never knew of a seaworthy barge constructed in this way is not to be taken as controlling, in the face of the other testimony of Mr. Wathen, which is uncontradicted by Mr. Stein, that 60 per cent. of the barges engaged in this type of trade are constructed in the same way.

But, in addition to the foregoing, the court feels that weight is added to its conclusion that the barge is seaworthy by the findings of the surveyor, Mr. Bechtel, which are not contradicted, except in very general terms. That survey contains the statement of the master, which, while hearsay, is admitted by the stipulation, that twelve inches of water is the normal amount of water carried in the barge's bilges, and that, before bilge water would flood the ceiling, it would have to be thirty inches deep, owing to the thwartship and fore and aft construction of the floor timbers. This latter statement is testified to by Mr. Wathen, who apparently knows more about the barge than any other person presented to the court, and is not contradicted.

The survey further says that "the dampness of the cargo was not due to the bilges becoming flooded above the ceiling, but must have been caused by the normal water in the bilges splashing against the ceiling, due to the rough seas of September 16, 1930. This opinion being based on the fact that no distinct water line above the ceiling was found, and that there were varying degrees of depth of dampness in the cargo." Also, "that it was estimated that if all remaining cargo in the barge were leveled off, the depth of cargo would be approximately two feet, and that the average depth of damp cargo would be approximately one inch." It further appears, according to the survey, that "of the cargo inspected remaining in the vessel the amount damaged was at the bottom only, and depth of damage varied from 0" in places to approximately 3" in the port side after end of No. 8 or after hatch."

The court feels that those findings support a conclusion that the barge was seaworthy for the particular trip and for the particular type of cargo, and that to say that this relatively small degree of wetting of the lower part of the cargo proves an unseaworthy condition seems to impose a burden upon the owners of barges both with respect to their construction and their operation which this court is unwilling to impose, and which, from its reading of the authorities, it is not aware has, certainly in this jurisdiction, been imposed.

The facts just alluded to, that no distinct water line above the ceiling was found, and that there were varying degrees of depth of dampness in the cargo, all of them relatively small, satisfy the court that the splashing was not only, as admitted, splashing from the bilges, but that that splashing is not an indication of unseaworthiness. For, even though twelve inches of bilge water cannot be normally taken out of a barge of this kind, the fact, as testified to, and as contained in the survey, "that before the bilge water would flood the ceiling it would have to be thirty inches deep," would indicate that there was a margin of safety to the cargo, which is satisfactory under voyages of this kind.

The court does not mean to say, by the conclusions which it now reaches, that wetting of the cargo, under voyages of this kind, by some definite leaks, would always be necessary to prove unseaworthiness, because there may, of course, be situations where there is too much bilge water, and therefore the splashing of the bilge water would be an indication of unseaworthiness. But here the amount of it satisfies the court that the maximum was not exceeded.

I find nothing in any of the cases to which I have been referred which is persuasive of a contrary conclusion. I have been referred especially to my own decision in the Agwimoon Case, reported in (D. C.) 24 F. (2d) 864. Of course, I should be very reluctant to depart from that, particularly since it has been affirmed [31 F. (2d) 1006], but I feel that it is clearly distinguishable on the facts. There we were dealing with a question of leaks, and there were a num-

ber of facts which are decidedly nonexistent in the present case—lack of proper inspection, poor rivets, and a number of other elements which it is unnecessary to refer to. So also, in the various other cases to which I have been referred, there are one or more distinguishing elements, as, for example, liability for the quality of dunnage on the vessel, etc. Therefore I feel it is unnecessary to attempt to analyze and to distinguish in detail those various cases.

Suffice it to say, therefore, in conclusion, that the court finds that, whereas the restrictive clause, the special clause of the charter party in this case, does not absolve the vessel from the seaworthy requirements of the Harter Act (section 2 [46 USCA § 191]), also incorporated in the charter party, the vessel has sustained the burden of proof imposed upon it, to show that the vessel at the time in question was seaworthy for the particular cargo, and that the damage, which is admitted took place, was damage not attributable to unseaworthiness, but damage of an incidental character which all shippers under circumstances such as we have here must be held to assume, because of the character of the barge selected. The court repeats, however, that it does not mean to have it inferred from this decision that improper pumping facilities, or an excess of bilge water retained in barges, may not produce a result contrary to what was produced in this case, it being a question of degree.

A decree will be entered in accordance with this opinion, dismissing the libel.