## THE SMYRNA.

### BARRETT CO. v. WATHEN CO.

No. 3320.

Circuit Court of Appeals, Fourth Circuit.

Jan. 10, 1933.

William A. Grimes, of Baltimore, Md. (Bigham, Englar, Jones & Houston, of New York City, Janney, Ober & Williams, of Baltimore, Md., and Henry N. Longley and Ezra G. Benedict Fox, both of New York City, on the brief), for appellant.

John H. Skeen, of Baltimore, Md. (Emory, Beeuwkes, Skeen & Oppenheimer, of Baltimore, Md., on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and PAUL, District Judge.

PAUL, District Judge.

This case involves a libel brought by the Barrett Company, a New Jersey corporation, against the barge Smyrna and its owner, the Wathen Company, a Maryland corporation with its home office in Baltimore.

The Barrett Company is engaged in the business of handling and selling sulphate of ammonia, and, from the facts, in part stipulated and in part proven, the following appears:

On September 6, 1930, the Barrett Company and the Wathen Company entered in a charter party for the transportation from New York to Baltimore and the delivery at the latter point of a cargo of 750 tons of sulphate of ammonia. Pursuant to this contract, the libelant, about September 10, 1930, loaded the cargo upon the barge Smyrna, a wooden coastwise barge, the shipment being stored

upon the ceiling without dunnage. In the course of the voyage to Baltimore, heavy seas were encountered, causing the barge to roll considerably.

The barge did not leak more than is customary for such barges, and the pumps were properly operated. However, due to the manner of construction of the floor frames of the barge and to the fact, not known to the libelant, that the bilge pumps extended only to within twelve inches of the bottom of the barge, there was at all times twelve inches of water in the bilges. The rolling of the Smyrna in the heavy seas caused the water in the bilges to splash over the ceiling—a happening which, in maritime language, is designated as "blowing the bilges." As a result of this splashing over of the bilge water, a small portion of the cargo was wetted and dissolved. A claim of $892.09 is made by the libelant for that portion of the cargo lost or damaged and certain expense in connection therewith.

The Smyrna is a wooden, flat-bottomed, coastwise barge, constructed in substantially the following manner: Her bottom planking is four inches thick, and upon this planking there is first a tier of floor framing composed of timbers twelve inches high and fourteen inches wide, laid crosswise of the vessel. Upon this is a second tier of framing of timbers of the same dimensions, but running fore and aft, or lengthwise of the vessel. Upon this upper tier of framing is laid what might be called the floor of the vessel, but what is technically termed the "ceiling," and upon this the cargo was stored. The bilge pumps (one at each end) extended only to within twelve inches of the bottom of the bilges, or about to the point of the top of the lower tier of framing, and there were no openings or runways in the frame timbers of the lower (crosswise) tier. As a result of this construction, each of the channels between the timbers of the lower tier of framing was, under ordinary circumstances, filled with bilge water to a depth of twelve inches at all times. Whenever the water exceeded twelve inches in depth, having reached the top of the crosswise tier of framing, it would flow toward either the bow or the stern between the upper tier of frames, and would be subject to the action of the bilge pumps. While there was always twelve inches of bilge water, there was above this water an unfilled space of at least the same distance represented by the height of the upper frames, and upon these upper frames was laid the ceiling. It was testified that the water in the bilges would have to reach a depth of about thirty inches before it would come upon the ceiling or wet a cargo stored on the ceiling; although admitted that, when the vessel rolled heavily, the bilge water, at a depth of twelve inches, would splash and occasionally cause some dampness on the ceiling here and there. This latter eventuality, namely, the splashing of the normal twelve inches of water, is what happened in the present case and caused the slight damage complained of.

The charter party contained, among other provisions, the following, the construction and effect of which the libelant has questioned:

"1. The vessel shall be tight, staunch, strong and every way fitted for such a voyage and receive on board during the aforesaid voyage the merchandise hereinafter mentioned. * * *"

"2. * * * Cargo to be shipped on the skin of vessel at cargo and shipper's risk. * * *"

"11. It is also mutually agreed that this shipment is subject to all the terms and provisions of, and all the exemptions from liability, contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled 'An Act relating to Navigation of Vessels, etc.' Seaworthiness warranted only so far as ordinary care can provide, and owners are not liable for loss, detention or damage arising from latent defects existing at the time of sailing. * * *"

The act of Congress referred to in paragraph 11 is what is commonly called the Harter Act (U. S. C., title 46, §§ 190–195 [46 USCA §§ 190–195]).

The case of the libelant in the lower court involved the following contentions of law and of fact:

That there existed on the part of the Smyrna a warranty of absolute seaworthiness for the carriage of this particular cargo; that there was in the contract (clause 1) a specific undertaking as to the fitness of the vessel, and that, aside from this, such warranty is implied by law. That the provisions of the Harter Act (U. S. C., title 46, §§ 190–195 [46 USCA §§ 190–195]) which were by express agreement made a part of the charter party, do not operate to cut down or impair the warranty of seaworthiness. And that clause 2 of the contract that " * * * Cargo to be shipped on skin of vessel at cargo and shipper's risk * * *" is of no avail to the respondent and was invalid, because it was an attempt to limit liability as expressly prohibited by the Harter Act.

The lower court held with the libelant, on all of its contentions as to the law governing the case. From the opinion in that court (2 F. Supp. 351) we quote: "The court reaches the conclusion that the proper interpretation to be given to the joint use of such a restrictive clause [referring to Clause 2] as the one here involved and the Harter Act is that, regardless of the restriction, the Harter Act provisions still require that the vessel shall be seaworthy for the particular voyage and the particular type of cargo. * * *"

But the court further decided, as a matter of fact, that the vessel was seaworthy for the transportation undertaken by it, saying: "The court reaches the conclusion that the weight of the present testimony can lead to but one conclusion, and that is that the vessel was, for the requirements in hand, seaworthy."

The lower court having found for the libelant on its contentions as to the law, the only question before this court is whether we would be justified in setting aside the finding of fact made by the District Court to the effect that the Smyrna was seaworthy for the carriage of this particular cargo. If it was so seaworthy, then the provision of the contract (clause 2) as to stowage of the cargo is immaterial, as are also the provisions of the Harter Act; for, in that event, there has been no fault on the part of the respondent. There is no question here of error or negligence in the navigation, operation, or management of the vessel; no question of latent defects in the vessel or its appliances or of any condition unknown to the owner which might have been remedied by the exercise of due diligence. It is conceded that the barge was staunch and sound; that it was properly navigated and its pumps properly operated. The libelant, admitting these facts, contends that seaworthiness is not an absolute term; that a vessel thoroughly seaworthy and fitted for the carriage of one type of cargo may be plainly unseaworthy for the carriage of cargo of a different type, and that the Smyrna, from the very nature of its construction, was unseaworthy for the transportation of a cargo of sulphate of ammonia in bulk.

■ That "seaworthiness" is a relative term, the requirements of which vary with the nature of the cargo, has been so long and so well settled as not to admit of argument. The Thames (C. C. A. 4th Cir.) 61 F. 1014; The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The Benjamin Noble (C. C. A. 6th Cir.) 244 F. 95.

■ It is equally well settled that the obligation to furnish a seaworthy vessel does not make the shipowner an insurer of the cargo.

In the case of The Silvia, 171 U. S. 462, page 464, 19 S. Ct. 7, 8, 43 L. Ed. 241, cited and followed in numerous cases, the rule is stated: "The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport."

■ And it appears that the language used in clause 1 of the contract here, i. e. "The said vessel shall be tight, staunch, strong and in every way fitted for such a voyage, * * *" does not extend or qualify the obligation existing under the implied warranty of seaworthiness. In Bowring v. Thebaud (C. C. A. 2d Cir.) 56 F. 520, at page 523, the court in speaking of a clause of a charter party, identical with that quoted, says: "The warranty does not qualify in the slightest degree the ordinary obligation of the shipowner under an implied warranty of seaworthiness."

In McCaldin v. Cargo of Lumber (D. C.) 198 F. 328, 329, affirmed (C. C. A.) 202 F. 735, it is said: "A vessel need not be perfect. * * * The rule governing is founded, as usually in matters of this character, on good sense and sound reason. The degree of fitness demanded is that which an ordinary, careful, and prudent owner would require his vessel to have at the commencement of her voyage, having regard to all the probable circumstances of it. Carver on Carriage by Sea, § 18, p. 21. The charter party contains the warranty that the 'ship shall be tight, staunch, strong, and in every way fitted for the service.' The owners, in terms and by legal implication, warranted the seaworthiness of the vessel; that is, that she was reasonably fit for the service in which she was engaged as a merchant freight vessel."

The libelant introduced one witness, a marine surveyor, who gave it as his opinion that such a barge as the Smyrna, carrying twelve inches of bilge water, was not seaworthy for this cargo. He had never seen the Smyrna, and displayed no great familiarity with barges of this type; and knew nothing of the nature of the damage done to the cargo. The lower court comments that his testimony was not convincing. Opposed to this was the testimony of a marine surveyor who attended a survey of the barge and its cargo after arrival at Baltimore and who had made a formal report thereof; and also the testimony of Mr. Wathen, owner of the barge. The report of the first of these witnesses established the unquestioned soundness of the vessel, the

fact that the damage to the cargo was comparatively small, and was caused by the occasional splash of the normal amount of water in the bilges.

The testimony of Mr. Wathen was that this type of barge was in common use in the coastwise trade; that 60 per cent. of the barges operating along the coast were of the same type of construction as the Smyrna; that his firm owned fifteen barges of the same type; that he had never known a barge with double frame construction in which the bilge suction extended to less than twelve inches from the bottom of the vessel; that the Smyrna was constructed in the usual and customary manner for coastwise barges and had been regularly used in the fertilizer trade, and was still so used; that she was used for carrying fertilizer about 40 per cent. of the year, and carried cargoes similar in type to that in the present case.

The opinion of the lower court contains a full and clear discussion of the facts before it, and expresses the view—which we do not doubt to be the proper one—that there is no arbitrary or fixed rule for testing the seaworthiness of a vessel in cases of this sort, but that it is to be determined by the facts and circumstances of each particular case, stating that under some circumstances a barge having improper pumping facilities or retaining an excessive amount of bilge water may be deemed unseaworthy. The District Court, nevertheless, in this case reached its conclusion of fact in the following language: "* * * The court finds that * * * the vessel has sustained the burden of proof imposed upon it, to show that the vessel at the time in question was seaworthy for the particular cargo, and that the damage, which is admitted took place, was damage not attributable to unseaworthiness, but damage of an incidental character which all shippers under circumstances such as we have here must be held to assume, because of the character of the barge selected. * * * *"

This finding that the Smyrna was seaworthy is a finding of fact which comes to this court bearing the presumption as to its correctness that is always accorded a finding of fact in a trial court by the judge sitting as the trier of the facts. It should not be disturbed unless plainly wrong.

The doctrine is well stated in the case of The Benjamin Noble (C. C. A. 6th Cir.) 244 F. 95, 97, where it is said in part: "The accepted definition of seaworthiness is whether the vessel is 'reasonably fit to carry the cargo which she has undertaken to transport;' * * * and this test of course is one of fact, not of law. * * * It results that seaworthiness must be tested by the facts and circumstances of each particular case ( * * * Int. Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 224, 21 S. Ct. 591, 45 L. Ed. 830) ; and the advantages derived in the court below through observation of the witnesses cannot be overlooked."

In International Navigation Co. v. Farr & Bailey Mfg. Co., in 181 U. S. at page 224, 21 S. Ct. 591, 593, 45 L. Ed. 830, reference is made to: "* * * The justness of Lord Blackburn's observation in Steel v. State Line S. S. Co., L. R. 3 App. Cas. 72, that the question whether a ship is reasonably fit to carry her cargo must be 'determined upon the whole circumstances and the whole evidence.' "

And it is further said, in the same case: "On the question of fact in this case, we have the concurrent decisions of the two courts that the Indiana was unseaworthy at the commencement of the voyage, *and as we find no adequate ground to conclude that the finding was erroneous, the settled doctrine that it should be accepted is applicable.*" (Italics supplied.)

In the instant case, the judge of the District Court had before him full and clear evidence as to the construction of the Smyrna, as to the nature of the cargoes for which she was customarily used, and as to other matter bearing on her fitness for carrying this particular cargo. He had before him the witnesses, with opportunity to judge of their credibility and of the weight to be given their testimony. No showing has been made in this court which, under the principles above discussed, justifies us in setting aside the finding of fact that the Smyrna was seaworthy; and the decree of the lower court is therefore affirmed.